Good morning, ladies and gentlemen. Our first case for this morning will be Black Earth Meat Market against the Village of Black Earth. So, Ms. Bowden? How do you pronounce your last name? Boudwin. Boudwin. Okay. It's very close, though. Thank you. All right. Proceed. May it please the Court, my name is Danielle Boudwin and I represent the appellants. The Village of Black Earth orchestrated the perfect storm of events when it effectuated the closing of a legally operating business. It deviated from the core fundamentals of due process when it ordered the relocation of the slaughter operations. It did so, I thought, in a fairly gentle way. You get this December 10, 2013 meeting and all they say is, we're going to give you 120 days to come up with a plan to move the slaughterhouse aspect of the business. And then the plan needs to be able to be accomplished within a reasonable time. So, it's not clear to me why, if the Village thinks that the slaughterhouse aspect of things since 2008 has become a nuisance, that it can't do that. Well, there had been no judicial determination that the legally operating business had constituted a nuisance. But there were a lot of complaints. Do you think that there has to be some judicial predicate before they can, in a sense, just rezone? Well, this was different than rezoning. They weren't acting under the zoning policies that they had in place. Substantively, it's the same thing. They're saying this use has become inappropriate. I gather this is all activity since 2008. Yes, the slaughter operations had been in place for 60 years, and it wasn't until many years later that the Village decided that the operations were allegedly no longer in conformity with the current zoning. Right, because at least the Village says, because the volume and frequency increases and the neighbors are complaining about all of these negative side effects, you know, steers escaping, you know, awful in the streets, etc. Well, I believe that's why the Wisconsin laws then come into effect, which is illegal nonconforming use can't be terminated solely based on that increase in production. And there's procedures in place that the Village should have taken if they did truly believe that the actions constituted a nuisance. Ms. Bowden, the proposed bank loan or financing, what was the degree of expansion that was envisioned? There were internal renovations that were planned, new equipment necessary for a different type of slaughter. What about the footprint? Was that about to remain the same? Correct. The footprint was not to change whatsoever. It was all internal improvements and procedural aspects that were going to change inside. In addition to that deprivation... Is it just really a regulatory taking problem? And if so, wouldn't you need to go to the Wisconsin courts first with an inverse condemnation case? Well, there is still an inverse condemnation claim that was dismissed without prejudice that's going to be still pending in the state court. However, that's kind of part and parcel of the due process. There still was the insufficient notice and insufficient hearings that effectuated the violation of due process. So can you talk about notice a little bit? Because the Sixth Circuit, in their decision in the Hussein against City of Perrysburg case, makes the point, which had some appeal to me, that at some point you have to stop giving notice. You don't give notice of notice of notice. And they did in the December statement, the letter that came the day after the meeting, give you notice. Nothing had happened yet. They didn't say close today. So I don't know where the notice comes in. I'd like to hear a little bit about why you think it was inadequate. Certainly. Well, there was no notice, sufficient notice, prior to that December 10 motion. There was an agenda published that stated that the village board would be discussing nuisance and zoning issues, but there was no discussion that Mr. Durand should be prepared to bring in witnesses and cross-examine to protect his property interest in the right to slaughter at that location. But why isn't that notice that this is now on the table? So he has 120 days. He can do things. So I guess I just don't understand why that's not enough to get the ball rolling. Well, there was no notice prior to that order. They had decided on December 10 that they have 120 days to remove slaughter. No, no, that's not what it says. It says to propose a plan for moving things, and then the plan has to have a reasonable time. That's what the 120 days is about. I think the order is implicit in that, though, that they had already decided that there needs to be a plan acceptable to remove slaughter, and if the plan wasn't presented, they would take action. If there was no necessity to remove slaughter, there would be no necessity to bring a plan or no necessity for the village to take legal action then. So suppose the village after 120 days had filed a lawsuit, maybe a nuisance lawsuit in state court. Why at that point wouldn't the owners of the Black Earth meat market have had the opportunity to make the arguments that you're talking about, that this was a legal nonconforming use, that the footprint wasn't going to change, that it wasn't a nuisance, whatever arguments you're now presenting, why wouldn't that have been a perfectly good forum? Well, there still was the pre-deprivation remedies that should have been made available to the appellants. This was not a random and unauthorized action. This was the village board taking it upon themselves to order that. They wanted the business removed, so the business had to come up with a plan to get out. But there hadn't been a deprivation. I'm still trying to understand why what's going on isn't actually a pre-deprivation process. The appellants had their bundle of sticks. They had the property rights, and the village was telling them how they would be able to use those property rights without going through the proper channels. There were procedures in place if they believed there to be a nuisance. There were both formal and informal policies that the village had in place, in addition to Wisconsin statutes which talk about mitigation of an abatement of nuisances in a least restrictive means. Closing down a business operation is not the least restrictive means to deal with the issues that you had previously mentioned. The steers, which only happened on minimal occasions, and the animal byproducts, which also were remedied with new sanitation. Right. I mean, it's the list. Increased traffic, delivery trucks blocking the road, livestock noise, odors,  and the three times that I guess it was a steer, you know, went marching off through the streets of Black Earth. And if they believed those to be a nuisance, there were those procedures that they needed to follow, which could have corrected those individual actions. Suppose they had just brought a lawsuit without telling you at all, you know, we need to have this nuisance abated. Would that have been unconstitutional in your view? Well, I think then we would have run into the issue of not following the village ordinances and potentially a different deprivation. However, in that case, it would have been a lawsuit to abate the nuisance, not a lawsuit to remove slaughter. And I think the distinction is that one potentially could have been brought under Wisconsin law and the remedies would have been changing the delivery times or dealing with the steer or dealing with the blood and runoff. And one would have been removing and closing down a business. To close down the business is not the least restrictive means to abate what they believe to be a nuisance. Well, what about the argument that it simply, Ms. Bowden, is a request to submit plans, with of course the implicit threat of eventual litigation? Well, I think the distinction there is that it wasn't, that the threat was at the end, that if a plan acceptable wasn't provided, they would take legal action. And if the requirement was not to ultimately remove slaughter, there would be no need to bring the plan and then no need to sue for it. Well, but the request to submit the plan, is that in itself not only notice but some sort of process, due process? Well, it deviated from the process that they should have taken, which was established, again, taking the least restrictive means. And going back to that, the least restrictive means are not removing. Well, in response to the request for the plan, could not, would the response of the company cause the company and the village to, at that point, engage in some sort of process which would mirror what the ordinance requires? Well, they did actually come together and attempt to work out a plan for a number of months, after which time Black Earth Meats actually did present two distinct plans that would have removed the slaughter operation. They provided two additional plans to mitigate the complaints, but even after providing those two plans, the village still authorized their attorney to commence legal action. So it appears that the request for the plan is merely pretextual to kicking the business out of town, because even after the plans were provided, they still authorized the attorney to take action. But why is that? I mean, there are two things here. One, one of the plans did, I gather, involve relocation of the slaughter operations. I guess nobody was worried about the butcher shop, the shop itself, but the slaughter operations. And accompanied with that was this motion that, I'm forgetting his name, but that the owner wanted passed, essentially resolving the legal issue, saying, you know, my business isn't a nuisance. And it didn't surprise me that they didn't want to pass that kind of conclusory motion. Why couldn't he have just litigated and either won or lost? I mean, you can't assume he would have lost any lawsuit. Well, that's actually, you know, they did bring the lawsuit because they believed that the deprivation had already occurred. Your clients did, yeah. Correct. No, but if the village had sued him, why couldn't he have made his arguments?  They had noticed that if they continued the actions they were taking, it would disrupt the financing agreement with the Bank of New Blarus and reach the same result of shutting down the business. The notice was given at the end of December and then again in June and then again in July that if slaughter couldn't continue at the current location, Mr. Durand would lose the financing. The Black Earth Meats facility would need to shut down then. And so there was no need for them to litigate at that point. So Mr. Durand never looks into alternative locations for the slaughter operation? He does, and he had been discussing that with the village president and the village board members, trying to work with them to find a facility outside of town to relocate the slaughter operations. There was just not cooperation from the town who didn't want to pay for what they wanted to do. Well, who would ordinarily have the burden of looking? I mean, obviously outside the corporate limits of Black Earth means that it's not their concern anymore. It's the county or it's another municipality or something. Why would the village need to pay for that? Because that would mirror a condemnation proceeding, that they would be essentially buying it out and moving them? See, that's what I keep worrying about with this, that even though you're calling a lot of these things due process claims of various kind, in substance, a lot of them look to me like regulatory takings. It was the village's decision that they didn't want this use in the village that caused him to lose his business. That's obviously a significant thing for a person, but it sure sounds like a regulatory taking. Well, I think there is a takings aspect, which is why a takings claim is also brought with the concern here. But why isn't that really the whole thing? Because there were issues along the entire process with the notice and the hearings and the infringement on a number of the rights that were not, until recently, totally taken. They were simply deprived in the due process sense in that the government was infringing on the use of those rights without actually taking them. The government never actually took the financing agreement. They never took the legal nonconforming use, but they did prevent. They were just down the road consequences, but there's some outer limit to that in terms of compensability for state action. Correct, but there is still that inverse condemnation claim that's pending, which is the other side. No, I have no problem with the inverse condemnation claim. I'm trying to figure out, even if notice had been perfect and they'd been very up front, we're trying to shut you down. That would have been inverse condemnation, it seems to me. But they were taking the action under a nuisance approach, which I think even removes it from that land use concept. This wasn't necessarily just all a land use taking. They didn't actually take the property. They were just telling him he couldn't use his property, and that's where the due process deprivation comes in. And I think the distinction in the Reed case that's cited in the appellant's brief really demonstrates how this is more of a due process deprivation, which is the use of property is being restricted by the government without going through the proper channels, and that's what happened here. The village didn't consider any of those plans to relocate, which affirms that the entire request for the plan was pretextual. They just wanted the business out of town. Was it one or two plans that he presents in July that actually involves physical relocation? There were two of the four. Two of the four. I know two of them, or some of them, didn't. Correct. Some of them looked at an alternative mitigation of the concerns, but the village didn't consider any of them. The record demonstrates that they didn't ask any questions of the people who presented. They didn't question Mr. Durand. They looked at the document, which is about 40 pages in about 40 minutes, and shortly thereafter authorized the attorney to take legal action. So does the record show whether Mr. Durand was trying in some fashion between December and July to eliminate the sources of concern? Yes, and I see that my time into rebuttal has now begun. You are on your rebuttal time. You're welcome to save it if you wish. I would like to save it, but if I could just answer your question. He did take steps to mitigate that and actually had been doing it prior to December of 2013. Okay. Thank you. All right. Thank you. Ms. Lubinsky. May it please the Court, my name is Lori Lubinsky. I'm here with my co-counsel, Eric Hunt. We represent the Village of Black Earth. This case is about a municipality's right to protect its citizens from the misdeeds of its own corporate citizens. It's about a village's right to foreshadow future consequences for ongoing violations of municipal law. Why didn't you just rezone? I mean, there is a process that villages or municipalities go through with rezoning, and if either because the facility was getting busier or because Black Earth was changing in its demographics or its uses, you would go through that. You have to jump through the right hoops, and if you get to the end of the day, then maybe the slaughterhouse has to move. Zoning, rezoning was an option, but it was not the only option for the village. Candidly, the record that we developed didn't go into detail in terms of why the village chose the actions it did. I would agree that that is an available process, but this was not a zoning process that they used. No, it wasn't, but that's actually one of the problems Ms. Bowden is talking about. And one wonders, looking from that December 2013 meeting, whether the village had just absolutely made up its mind that they were going to put this guy out of business in the village, and that doesn't sound a lot like due process if this is a fait accompli. Well, I think the words of the motion answer that question. The words of the motion in December of 2013 were, in fact, that the village of Black Earth was saying to Black Earth Meats, you have 120 days to come up with a plan to relocate. But it's a plan to relocate. It's not a plan to address all of these complaints and problems. So one way you might address the complaints is have a better way of confining the animals or a better way of dealing with your waste products or a better delivery system or whatever. That doesn't seem to have been on the table. I would agree with you, but what comes next in the motion is the most important part of what this case is about. This is a due process case. So what the village said is, you have 120 days to come up with a plan, and if you don't come up with a plan to relocate that's acceptable to the village, what does the motion say? We will go to court to seek a court order to enjoin the slaughter, which, of course, we can all agree provides due process. The village was not, by the very words of the motion, ordering them to stop slaughter. Not then, not later. What the village was saying was, you know what, we will, in essence, forbear going to court now. We will give you, let's work on this together, we'll give you an opportunity to make your fate. And your fate can lie in what you come up with, if it's acceptable to us, and assuming, and there is a part in the record that talks about, you know, you need to make sure that you make reasonable effort to stop these ordinance violations. But assuming that, you've got time. Let's work together. But the only answer that was going to satisfy the village, it says in that very first motion, is relocation. Correct. And that's the problem, because it's not logically necessary that that's the only way it happened. There are slaughterhouse operations that don't dump, you know, waste parts into the streets, and he's never given the chance to address the village's concern in any way, but the one way the village has left him. Well, he was actually given the chance. He was given warning letters back in 2012. In 2013, he was given citation after citation after citation after citation. And so the village was in a position where this isn't working. We've cited him a number of times, and it's not getting any better. And so the village said, you know what, we're not going to take you to court right now. We're going to do that if you don't come up with a plan to relocate. We'll give you time to do that, and if you don't come up with a plan to relocate, we will go to court. And then, as counsel correctly indicated, when the plan that they came up with was options as opposed to here's what I'm going to do, and by the way, village, you should pay for it. Millions and millions of dollars pay for me to relocate. The village said to its attorney, you know what, go ahead and pursue what legal action may be appropriate. Why couldn't the village for the July plan have simply said, we really meant it when we said you need to use a plan to relocate this. We see that there's at least one. It's not 100% clear to me whether they're one or two, but there certainly was a plan in that package that the consultant put together. And the village said, okay, that's it. We're going to take it. You need to proceed along those lines. The plans that were come up with, all of them involved substantial village payouts, number one. Number two, what the village officials have testified was their idea of a plan was not what Mr. Duran's idea of a plan was. And there was a difference of agreement. To answer your question. What was the difference? The village official's idea of a plan was here's what I'm going to do, here's the steps or timeline in which I'm going to do it, and here's the process. Instead, what Mr. Duran came up with is several options. There were more than one, absolutely. And I'm willing to do any of them as long as you pay me for it. There was no timeline. There was no actual concrete steps made, and that's all in the record. And so the village at that point said, you didn't come up with a plan. Not only did we give you 120 days, we gave you an extra 90, and that's undisputed. There was a stipulation to extend that. So what are we going to do? We're going to authorize our attorney to proceed with whatever legal action may be appropriate. The notion that a government telling a citizen, we're going to authorize our lawyer to seek a court order to enjoin slaughter, that that's a deprivation when it's self-evident that in order to pursue that action, one must file a lawsuit. And a lawsuit involves process. What's really going on, just so we take the curtain away, what's really going on is they had no money to finance the operation. They needed money from a bank that said, I'm only going to loan you money if you get a guarantee from the USDA. And the USDA says, I'm only going to guarantee that loan if you tell me there's no threat of litigation. So the position here that's being advanced, just so we're all clear, is that the government is going to have to succumb to the private contracts of individuals and not pursue its corporate citizenry for violating ordinances. Is it the village's position that because there are a series of ordinance violations, which were not complied with, that the village then decided you either leave town or we sue? Is that the bottom line? You talk about drawing back the curtain. What's this case about? So you want them out of town. Because you did not pursue legal action on the ordinances, you then say, well, here's your option, leave town. And if you leave town, then we won't sue you. Is that what this case is about? No, it's not about that. Number one, ordinance violations continued, citations continued. No, I appreciate that. I'm not trying to gloss over what you've said about the violations. But at some point, the village says, because of this history, you've got to leave town. The village said, yes. Let me answer the question. Yes, the village made a decision to say, if you don't come up with a plan that we agree with to relocate, we're going to sue you. Well, the plan is just to leave town. The plan was to leave. Only one plan, that's the point. Yes, I would agree with that. The plan was to relocate outside the village. And if you don't, we will pursue legal action to enjoin or restrain that. Yes. So that's a very broad position because it suggests that people who live in the village of Black Earth who are doing things that are perfectly lawful under the zoning ordinances and other land use regulations can simply, at the stroke of a pen, be told, no, you actually have to leave. We don't really care whether that means you close your business or whether you find another location. And that's not usually the remedy for nuisance. The remedy for nuisance is to pursue injunctions. There's no reason to believe that the Black Earth owners, Mr. Durand and others, would have gone into contempt of court for refusing to comply with injunctions. It's an extreme position. But that position never came to fruition because the plaintiff closed its business before a lawsuit could be filed. We don't know, to go to one of your points earlier, we don't know what would have happened in that court proceeding. All we know is the village was saying, we will stop for 120 days and then 90 more days. We won't take action. Come up with a plan. If we can't agree, we will take you to court. That's what they were saying. But the village, as you just said, knew perfectly well that with litigation pending, USDA was not going to guarantee his loan and the bank wasn't going to make the loan. So it's a very neat way to shut him down by shutting off his financing. The village did not know that as of December 10th. But they knew it by the time July comes around. They've destroyed his financing by that time. They have not destroyed his financing. He destroyed his financing. I would say the village, by making it very clear that litigation was pending, made it impossible for him honestly to say on the forms that USDA provides there is no threat of litigation when he knew that there was. Yes. It is undisputed in this case that the threat of litigation resulted in the bank's decision to not loan him the money, which resulted in his closure of the business. Yes. That is what happened. But any other result in this case would mean that the government cannot sue one of its corporate or individual citizens when there's a private contract saying, you know what, we're not going to give you money if you're sued. I don't agree with that at all. I mean, the government could have sued him in December, as far as I know. You could file a lawsuit. Maybe he could have filed a lawsuit for declaratory judgment, for all I know. But I don't think that there's no possibility of suit. This is all about who pays for various things. And I guess maybe you're agreeing that there might have been a regulatory taking because he's been deprived of the ability to use his land in a lawful way, and that's regulatory taking stuff. No, I'm not agreeing there's a regulatory taking. In fact, the plaintiffs have conceded in this case. And we pointed this out in our brief, and I can cite the court to the section, but the plaintiffs have conceded. This is at docket 105, Plaintiff Summary Judgment Brief at page 21. Quote, Plaintiffs concede that there has been no formal land use regulation enacted by the Village Board rendering the procedures for inverse condemnation, Wisconsin takings, and federal takings claims unavailable and inadequate. Well, that's not saying that there isn't a regulatory taking. Listen to what you just read. They're saying we can use these inverse condemnation procedures because that's what you've done. Now, obviously, the village's position is going to be we didn't do that, but their position is going to be yes, you did. Their position is, quote, no, there was no formal land use regulation. They are conceding that the December meeting did not impact their use of their land. Read that whole sentence again. I don't hear it at all the way you interpret it. It's a quote. Plaintiffs concede that there has been no formal land use regulation enacted by the Village Board, comma, rendering the procedures for inverse condemnation, Wisconsin takings, and federal takings claims unavailable and inadequate. So it depends how you read that rendering business because you're reading that as no formal action and thus there is no way to use inverse condemnation. They might be reading it as saying, and they say it's pending, that there hasn't been anything that the village has done that would prevent them from using these procedures. You're correct. I read it the former. When they say there has been no formal land use regulation enacted by the Village Board, what that says to me is they are agreeing that we didn't enact anything and order a regulation that said you can or cannot use your land. How do we know that? So why does it have to be a formal enactment? What if you just send the police out every day and just issue citation after citation after citation after citation? That's action. That's state action by the village. It could make it impossible to comply with all of these citations because actually another position the village has is that the existing laws are already enough to require shutting this place down, the slaughter operations. If I understood your question correctly, the answer is that if a police officer went out there day after day, cited them, could it in theory constitute a land use regulation? It would depend on the nature of those citations. If they were just being cited for fines, it would not. If the citations were to pursue other relief, it possibly could. Part of what the village is after is cease and desist. They don't want the trucks, for example. It might be a very reasonable thing. They don't want the trucks completely blocking the streets, which apparently the trucks did from time to time or maybe commonly. So you didn't want a fine. You wanted them to stop doing it so that people could drive down the street. Correct, and I think that's, in general, why a lot of municipal police enforcement occurs is to get compliance. We were looking for compliance. We didn't get it. Citation after citation is issued after warning after warning, and then we're at a point where this isn't working anymore. So yes, did the village have an option in December of 2013 to file a lawsuit? Absolutely. Why didn't you? Why go through the charade, if you will, of asking a company to leave town? Because it's not a charade. They knew that they would need a court order. How do we know that? It's right in their motion themselves. They said, if they don't come up with a plan acceptable to the village, then. But the only plan acceptable to the village, as I understand it, Ms. Levinsky, is to leave. To relocate, correct. Yes. Relocate, leave. I'll take your language. It doesn't matter. Get out of town. Yes. Get out of town. Yes. Well, so if all these ordinance violations were piling up and you say, listen, this is not a good corporate citizen, then the action is to legally go ahead and remove them, not just say come up with a plan to tell us how soon you're going to get out of town to save us litigation costs. And the village was trying to be a good village, working with its corporate citizen to give them an opportunity to be involved in the process. And this is a due process claim. This is about you didn't give us notice of this alleged deprivation. What do we know? Well, they also have their equal protection class of one claim. They also have a substantive due process claim. They have a series of 14th Amendment claims. I would agree. But as it relates to their due process claim, which is what we've been talking about today, as the court indicated, they had notice. I mean, we've been talking about the property interest deprivation, but, of course, there's still the issue of what the notice is. And as we all know, we've got to look at what the nature of the deprivation is to decide what the notice is. They had notice. Mr. Durand, who's an attorney, the owner of Black Earth Meats, he had notice through the agenda of the meeting. He attended the meeting. He spoke at the December meeting. He was there. He participated. He was part of that process. He was also part of the process of working with the village for 120 plus 90 days. They worked together. There was a grant that they worked on. And at the end of the day, he came and he presented the plan. He had his planners come in and present, and then he presented. And as your Honor indicated, there was this motion that he wanted the village to file. But ultimately, did he get notice of what was going on? There's no doubt he did. How do we know that? After December 10th, they kept slaughtering. I mean, the business is going on. It's not like anyone, there's like a piece of paper saying, you know, you have to leave by tomorrow. No. What this process was is they're going to continue on with their business, come up with a plan. And if it doesn't work, if we can't get an agreement, we're going to go to court. See, the problem is that's why there's a substantive element, whether it's equal protection or whether it's substantive due process to their claim, because you can give all the notice in the world of something that's illegal. I could give notice that I've decided to take your car away from you, and you know that. But if I don't have a right to take your car, then knowing that I'm planning on it doesn't really help. So notice of what? And I think underneath it is their sense that what they're being told about is impermissible action by the village. But their claim is a due process claim. I know. That's what I'm saying. Due process, equal protection, substantive due process. So what they should have done is what your Honor indicated earlier. Why don't you go to court, argue to the judge through process, the village doesn't have a right to enjoin or stop slaughter. And then we get a court order, as your Honor has indicated, saying, village, you don't have that right, but I'm going to stop you Black Earth Meats from having all the nuisance issues. They didn't allow that process to continue. I heard counsel say, well, then all of a sudden it stopped. The reality is what happened is after the July 10 meeting, they only slaughtered for eight days and they stopped operation. It wasn't as if the village, when they said on December or, excuse me, July 7th, 10th, excuse me, July 10th, we've given you the time. I see my time is up. You have one minute to wrap up. Okay. It's not as if they said, you know what, at this point, we're just going to wait and see. What they said on July 10th is, lawyer for the village, please proceed. Go to court. And what happened is they stopped business because of a private contract they had, which effectively prohibited them from getting financing merely because my client wanted to protect its corporate citizens and bring that lawsuit. That's all I have. Thank you. All right. Thank you. Anything further? I imagine so. I would first just like to discuss that threat of litigation and the concern within the conditional commitment. The conditional commitment has language in it that is not threat of litigation, period. It's threat of litigation that affects the collateral of the financing and the business operations. Had the village brought a nuisance lawsuit, there would have been no impact to the collateral because as your honor pointed out, it would have been, the business could have been ordered by a judge to change the delivery times or change the animal procedures for holding. The judge, under Wisconsin law, could not have ordered the shutdown of a business. And so when the village took action to remove slaughter and not to just abate the nuisance, that's when the collateral was impacted. And they had notice of that in December. They had notice of that when Mr. Durand sat before the board in July of 2014 and said, we're at the verge, we're on the edge of crisis, and if you don't allow me to continue slaughtering, you've affected my business and the collateral is gone. And therefore, the financing is gone. How long did he have in the final analysis to satisfy that condition of USDA? The conditional commitment and the loan were actually set to close in about December of 2013, but the bank was trying to work with Mr. Durand and extend it. They were hoping that he could resolve issues with the village, but when the village finally decided to take action in July, that's when the bank could no longer get any more extensions. And I think it's important. So you're telling me that had the July meeting gone in his favor, somehow or another, that it still would have been time, there still would have been time for the bank to extend the loan? Yes, absolutely. It wasn't until after the bank had received word that the village was going to be taking action on its previous threat to remove the slaughter operations that the bank could no longer get financing. But I think it's important to focusing on the equal protection and kind of the hostility element that we've kind of skirted over is that the village trustees were very vocal about their intent. The intent was get the business out of town. There's information in the record where trustees had made statements to some of the complaining neighbors that if they continued making complaints with their help, the village would be able to get the business out of town. That's this Ms. Mickelson? Correct. Trustee Frey discussed that with Mr. Mickelson, or Ms. Mickelson, excuse me. So I think that kind of brings in not only that equal protection, but I think it gives some clarity to the intent of the motion. One of the trustees also testified that the intent of the motion was to remove those slaughter operations. So, again, the pretext of whether or not the plan could have actually been presented, but the only plan that could have worked was they get out of town and they pay for it. But there was no financing because the village knew that the threat against the collateral would declateralize the loan and effectively choke them out of their business financing. And Judge Posner discussed this in the Backpage case that the appellant cited in their brief, where what the village did was take a roundabout way. They were choking out the business instead of just going on a full frontal assault and telling them they had to close down. They were pulling the financing. Of course, a big part of Backpage was the First Amendment. Correct. You're not supposed to chill people's speech, so I'm not sure how readily it translates. I think just the example that he had given with the impact of the financing and what the village was doing here and what the village did knowingly, because they had the information in December of 2013, and they had the information the entire time they were attempting to work with Mr. Duran. They knew that if they were not able to come up with some kind of agreement to continue slaughter operations at the current facility, the financing would be pulled and they would get what they wanted without having to go to court. So the village keeps saying, we could have gone to court, the appellants could have gone to court. The same goes for the village, and the burden is on the village. If they want a business out of town, if they want to remove something, there are procedures in place. They have ordinances which show how they should have mitigated the nuisance issue, and they deviated from that norm, both in the due process sense and in the equal protection. They had an established norm, and they didn't follow it. They didn't follow the ordinance. They didn't follow the warnings necessary. They didn't follow the abatement time necessary. And you think if they had followed all the right procedures, there would have been a solution to this problem short of shutting the business down? Absolutely. Because there would have been no impact to the collateral, which was slaughter is gone. I see that my time is up. Thank you. All right. Thank you very much. Thanks to both counsel. We'll take the case under advisement.